## W. J. JORDAN *v.* THE STATE.

1. MURDER — SELF-DEFENSE.— CHARGE OF THE COURT which, upon the
   question of self-defense, abridges the right of a defendant to act
   upon reasonable appearance of immediate danger to life or of
   serious bodily harm; or that instructs the jury in effect that they
   must find affirmatively that the danger was actual and real, or that
   the defendant must show affirmatively that he could not reason-
   ably know that the danger threatened was not in fact real, is error.
2. SAME.— It is not necessary that the danger be actual and real, pro-
   vided the party acted on a reasonable appearance and belief of
   danger. See the opinion *in extenso*, for the question and authorities
   discussed, and for a charge on the subject *held* fatally defective.

APPEAL from the District Court of Fayette. Tried
below before the Hon. L. W. MOORE.

The indictment charged the murder of Joseph Hassel-
meyer, on the 14th day of July, 1881. The conviction
was for murder in the second degree, with the punish-
ment assessed at a term of fifteen years in the peni-
tentiary.

In addition to the testimony of Kennon as set out in
the opinion of the court, the State proved by the widow
of the deceased that, about sunrise on the morning of
January 14th, 1881, the deceased left his house to go into
his patch to cut cane with which to feed his hogs. Shortly
after he left the house, the witness heard the barking of
her dogs, and, looking in the direction, she saw the
deceased standing near the cane-patch, at the edge of
some cotton-rows. Presently the dogs returned to the
house and the witness went to her cow-pen to milk, and
while there heard two reports of a gun. She looked in
the direction from whence they proceeded, southwest,
and saw the defendant going from that point towards his
house, carrying a gun in his hands. The witness, at the
time, had climbed up on her gate, and could see the de-
fendant distinctly. She remained at the fence for a short
time and then went to the house, and finding that the

deceased had not returned she became alarmed, and presently went to the house of a neighbor, Mr. Hilmer, and requested his assistance in searching for her husband. About one hour had elapsed since the shots spoken of were fired. After searching in several directions, she and Hilmer found the dead body of her husband at the point where the shots were fired.

Hilmer, from there went to Flatonia to notify the authorities, and the witness went to the house, but presently returned to the body with the mother of the deceased and Mrs. Bruner. Mr. Burns came presently and agreed to watch with the corpse until the officers arrived, and the witness, her mother-in-law and Mrs. Bruner returned to the house. The deceased did not own a pistol, had none about his person nor about his house. He had no hip pockets in his pants, and only a pocket knife. He was in his shirt-sleeves when his body was found. The defendant and the deceased had a law-suit about hogs in the fall of 1880, and had not been friendly since.

H. Hilmer testified for the State that he lived about seventy-five yards distant from the house of the deceased. When he was turning his cows out on the morning of January 14, 1881, he heard two reports of a gun. He looked in a southwest direction, from whence it proceeded, and saw smoke rising from about the spot where, afterwards, he and Mrs. Hasselmeyer found the body of the deceased. He corroborated Mrs. Hasselmeyer as to her coming for him, their joint search for and discovery of the body. When found the body was extended face upwards, with the right hand thrown down by the side, and the left up towards the shoulder. The witness looked about the body for fire-arms but found none. The deceased had been shot through the left eye. The witness got Mrs. Hasselmeyer to go home, and he went to Flatonia for the officers, found and advised them of the killing, and then went to his own home.

C. Stoffers testified that he was one of the jury of in-

quest. He saw the body of deceased lying in the road, back down, face upwards, with the right hand resting by his side, and the left on, and a little under the body. Weapons were looked for, but, save a common pocket-knife, closed and in a pocket, none were found. The left eye had been penetrated with, apparently, a load of shot, besides which no other wounds were found. The body lay about 500 yards from the house, and about 175 steps from the fence of the deceased, and about 200 steps from the defendant's cow-pen. There was timber and under-growth between the body of the deceased and his field-fence, and thick timber and undergrowth between the body and defendant's cow-pen. From the house of the deceased to defendant's house the distance in a direct line is about 415 steps, the defendant's field intervening. At the time of the killing, cotton and corn were standing in the field, but, nevertheless, a person standing at or near the house of the deceased could distinctly see a person at either the defendant's house or cow-pen. The witness knew this by experiment.

Martin Sloan testified that he was one of the party who arrested the defendant. They failed to find defendant at his house, and went to Kirksey's and asked if he was there. The reply being affirmative, the party went into the house. As they went in, the defendant met them and said, "well, boys, I got into it, this morning." He was not then under arrest, nor had he been told the purpose of the party in going to the house. The witness replied, "yes, and we have come after you." The defendant then took a small six-shooting pistol from the mantel, and handed it to Lane, one of the party. Thence he was taken to the corpse and delivered to the officer, Mr. Doggett.

H. W. Yeager, for the State, testified that a person at or near deceased's house could readily see and recognize another at the defendant's house or cow-pen. He was positive of this fact, having verified it by experiment.

C. W. Burns was the first witness for the defense. He testified that he resided, at the time of the killing, in Flatonia, about five miles from deceased's house. When he received the news of the killing, on the morning it occurred, he went direct to the corpse, where he found Mrs. Hasselmeyer, Mrs. Bruner, and the mother of the deceased, and relieved them in their watch over the body. The deceased was lying on his back, his right hand by his side, and his left under his body. A gun shot had penetrated the left eye. The witness saw neither gun nor pistol about the body. He examined for tracks, and found some leading from the body in the direction of the house of a son of the defendant. He found none leading towards defendant's house. While waiting for the jury of inquest, he went up to defendant's house for a drink of water, but said nothing about the killing. The topography of the vicinity, as described by this witness, corresponded with that given in the evidence for the State, except that he stated, in addition, that defendant's house was 75 yards farther from the body than his cow-pen was. The witness had stood in the cow-pen of the deceased and attempted to recognize persons at the defendant's cowpen. He could see persons at but one point near, and could not possibly recognize them.

Mrs. Laney testified for the defense that she was a daughter of the defendant. About sun-rise on January 14, 1881, she was in the cow-pen milking, the defendant and her son being with her. While there they heard dogs barking and hogs squealing. The defendant remarked that Hasselmeyer's dogs were after his hogs and he would go down there. In a few moments she heard defendant say, "Are you going to kill my hogs?" She heard deceased reply "No! d—n you; I will kill you!" She then heard two shots, and saw no more of the defendant until after his arrest. She knew that it was the deceased who said "No! d—n you; I will kill you!" by his voice, and his speaking broken.

Jas. Jordan, a son of the defendant, testified that his father came to his house about 7 o'clock on the morning of January 14th, and had his shot-gun with him, one barrel loaded. He told witness about the killing, and gave him a note to take to Flatonia. The defendant left his gun at witness's house, and went to Kirksey's, about 300 yards distant. The defendant had no pistol. Defendant was between sixty and sixty-five years old.

One witness for the defense testified that the deceased was left-handed, and another that the defendant's reputation was that of a peaceable, quiet, law-abiding, inoffensive old man.

*Moore & Lane* and *Phelps & Haidusek*, for the appellant. The court below erred in its charge to the jury upon the rules essential to be observed in the exercise of the right of self-defense by the defendant.

In this cause it was the duty of the court in charging the law of self-defense to give the law in full, to wit:

First. The right of defendant to slay Hasselmeyer if done to prevent deceased from murdering or maiming him.

Second. The right of defendant to slay Hasselmeyer if he, deceased, was making any other unlawful and violent attack on defendant after using all other means to prevent the injury, but that defendant was not bound to retreat to avoid the necessity of killing the deceased.

Third. That defendant had a right to slay deceased if he was attacking him in such a manner as to produce in the defendant a reasonable expectation or fear of death, and that it made no difference whether the danger was real or imaginary if defendant believed it to be real.

In this charge the court makes the jury the judges, from the facts in evidence before them, "*whether or not the defendant was in danger, or that there was a real appearance of danger.*" In the case of *Blake* v. *State*, 3

Texas Ct. App. 583, the lamented Judge Ector said, in laying down this branch of law: "It is not enough that the party believed himself in danger, unless the facts and circumstances were such that the jury can say he had reasonable grounds for his belief." In this cause the court below goes farther and virtually charges the jury that defendant should have stopped and examined whether or not deceased had a pistol when he threw his hand behind him, and that he should not have fired until he saw the weapon in the hand of deceased. Penal Code, arts. 570, 572, 573 and 574; *Lister* v. *State*, 3 Texas Ct. App. 17; *Blake* v. *State*, 3 Texas Ct. App. 583; *Babb* v. *State*, 8 Texas Ct. App. 177, and authorities there cited; *Ainsworth* v. *State*, 8 Texas Ct. App. 537; *Hill* v. *State*, 10 Texas Ct. App. 625.

The court below erred in that portion of its charge to the jury in which it informs the jury of the weight to be given to the confessions or admissions of a defendant when the same are introduced in evidence by the State.

It was the duty of the court to instruct the jury that when the admissions or confessions of a party are introduced in evidence by the State, then the whole of the admissions or confessions are to be taken together, and the State is bound by them unless they are shown to be untrue by the evidence.

Upon this branch of the case the court charged the jury as follows: "The State having introduced the confessions or admissions of the defendant, *if the same are reasonable and consistent*, the State is bound by them, unless by other circumstances and facts the same is disproved, and such admissions or confessions the jury should consider in connection with all the facts and circumstances of the case, and you should determine from all the evidence whether *in fact* the deceased *did in fact* make such a demonstration as to produce a reasonable belief of danger as before defined." This charge is not in accord with the

law of our State or the decisions of our courts; and the
fifth charge asked by defendant and refused by the court
contained the law of the case as applicable to this branch
of the evidence. *Pharr* v. *State*, 7 Texas Ct. App. 478.

The court below erred in refusing to give in charge to
the jury the charges asked by defendant.

The charges, one, two and three asked by defendant
contained the law of this State upon the subject of self-
defense, and it was error in the court to refuse to give
them.

Defendant asked the court to give in charge to the jury
the following charges, to wit: "First: Defendant would
be justified in the killing if it is shown to have been done
to prevent Hasselmeyer from murdering or maiming him;
but in that case it must reasonably appear by the acts or
by the words coupled with the acts of Hasselmeyer that
he intended to murder or maim the defendant, and the
killing must have taken place while Hasselmeyer was in
the act of committing such offense, or after some act done
by him showing evidently an intent to commit such
offense. If, therefore, you believe from the evidence that
at the time of the homicide deceased told the defendant
that he would kill him, and made gestures as though to
draw a weapon, and that defendant did believe that de-
ceased was about to murder or maim him, and that while
deceased was in the act of making such hostile demon-
stration, defendant shot and killed him, then defendant
was justifiable in slaying the deceased, and you will
acquit.

"Second: If you believe from the evidence that de-
ceased made any other unlawful and violent attack upon
defendant besides one with intent to murder or maim
defendant, then defendant would be justified in defending
himself from such attack and in taking the life of de-
ceased. But to justify himself in killing Hasselmeyer, to
defend himself from an attack from Hasselmeyer, not

amounting to an assault to murder or maim, defendant must have resorted to all other means for the prevention of the injury, and the killing must have taken place while Hasselmeyer was in the very act of making such unlawful and violent attack; but in this event defendant would not be bound to retreat to avoid the necessity of killing the deceased.

"Third: If you believe from the evidence that defendant killed Hasselmeyer, but also believe that Hasselmeyer was attacking defendant at the time, and that such attack produced in defendant a reasonable expectation or fear of death or some serious bodily injury, then defendant would be justified in the killing, and it would make no difference whether such danger was real or imaginary, if it had the appearance to him of being real, and if he acted on such belief of apparent danger." *Blake* v. *State,* 3 Texas Ct. App. 588; *Marnoch* v. *State,* 7 Texas Ct. App. 274; *Babb* v. *State,* 8 Texas Ct. App. 176.

The fifth charge asked by the defendant contained the law of this State as announced by our courts in regard to the weight and effect of confessions or admissions of defendant when introduced by the State, and it was error in the court to refuse it.

Defendant asked the court to charge the jury as follows:

"Fifth: When the admissions or confession of the defendant are introduced by the State, then the whole of the admissions or confessions are to be taken together, and the State is bound by them, unless they are shown to be untrue by the evidence. Such admissions or confessions are to be taken into consideration by the jury as evidence in connection with all the other facts and circumstances of the case." The above charge is one which Judge Winkler, in the case of *Pharr* v. *State,* says "is substantially correct," and was refused; while the court gave one which informed the jury *that the State was not*

*bound by them "unless the same is reasonable and consistent."  Pharr* v. *State,* 7 Texas Ct. App. 478.

*H. Chilton,* Assistant Attorney General, for the State.

*T. H. Franklin,* District Attorney, also for the State. Where a defendant seeks to justify a homicide upon the reasonable appearance of danger, the reasonableness of such appearances is a fact that the jury must find before they can acquit.  Any other construction of the law would permit any defendant in a murder case, where the State has to put in evidence his statement of the manner of the homicide, to simply assert that he believed himself to be in danger at the time of the killing, and for that reason killed the deceased, and the State could not then inquire into the circumstances producing such belief. Nor could the reasonableness of such belief be passed upon by the jury.

In *Horbach* v. *State,* Judge Roberts says: "It is true the law requires a party killing to act under the responsibility to himself of acting soon enough to save himself from the loss of life or from serious bodily injury, such as mayhem on the one hand, and on the other the risk of exercising firmness and discretion to wait long enough until some act is done by the deceased, at the time, by which *the jury trying the case will be satisfied, considering all the surrounding circumstances, and the parties concerned, that the defendant had reasonable grounds to believe, and did then believe, that he was then in imminent and impending danger of being murdered or maimed by his assailant."  Horbach* v. *State,* 43 Texas, 257.

The jury must be satisfied, 1st, of the act of deceased; 2d, of the circumstances surrounding and the parties concerned; 3d, in view of the act, the circumstances and the parties, of the existence of reasonable grounds for defendant to believe himself to be in imminent danger; 4th,

of the actual existence of such belief, at the time, in the mind of defendant. In the language of the charge, "the jury will determine whether in fact that the defendant was in danger, or that there was a reasonable appearance of danger."

In *Blake* v. *State*, 3 Texas Ct. App. 589, Judge Ector uses this language: ".Self-defense is a defensive and not an offensive act, and must not exceed the bounds of mere defense and prevention. To justify a homicide there must be at least an apparent necessity to ward off by force some unlawful and violent attack. *It is not enough that the party believed himself in danger, unless the facts and circumstances were such that the jury can say that he had reasonable grounds for his belief.*"

Second. Under the facts of this case this charge is peculiarly appropriate. The State introduced as evidence the bare statement of the defendant that he had killed deceased, and the defendant then drew out the remainder of said statements to show justification. The State then attacked the truth of some of said statements by evidence. It then became a question for the jury to decide, whether all of said statements were true or not,— whether it was a fact that defendant was in danger at the time of the killing, or that there was a reasonable appearance of danger, and whether such portion of said statements as showed a threatening gesture on the part of deceased was true or was simply an excuse for the killing fabricated after the homicide.

As to the second objection to the charge upon the subject of self-defense I submit that the same is not well taken, for the following reasons:

1st. Because, whilst it is true that, "where at the time of the killing, some act has been done by the deceased showing evidently an intent to murder or maim, then and there, in that event, the party thus attacked need not resort to other means before killing his assailant, be-

cause it is presumed in such a case that the party's safety depends upon his prompt action in killing his adversary" (Horbach's case); yet, when ordinary care on the part of defendant would *show him that the act done did not really evidence an immediate intent to murder or maim,* then he should be held to such care. Where a man takes that which God has given — life — and seeks to justify himself on the ground that he acted from necessity, certainly ordinary care should be shown upon his part to ascertain the reality of such necessity.

A brief reference to the facts of this case will show the absolute necessity of the existence of some such rule if any protection is to be given to human life in this State.

A man need not resort to other means to prevent the person whom he kills from murdering or maiming, before he kills such person, when he has reasonable grounds to believe himself in immediate danger of the loss of life or limb; but ordinary care should be exercised by him to ascertain the reality of the threatened danger in the meaning of the acts of deceased, the *reasonableness of his belief that he is about to be assaulted.*

What better evidence of malice,— of a reckless disregard of human life,— of a mind fatally bent upon mischief,— is there than the killing of one human being by another, when a little care exercised by the slayer would have shown him that the one whom he killed was in no condition to do him any injury?

Second. If a person is not justified in killing another upon appearance of danger, unless the facts and circumstances were such that the jury can say that he had reasonable grounds for his belief ("that he was in danger"— *Blake* v. *State, supra),* must not ordinary care be taken by such person to ascertain the reality of such danger, before the jury can be called upon to pass intelligently on the *reasonableness of defendant's belief?*

Third. By reference to the facts of this case it will appear that no injury could possibly have resulted to defendant from said charge even if the same is erroneous.

White, P. J.    There was no eye-witness to the immediate fact of the killing. Appellant's admissions or confessions with regard to the attendant circumstances were introduced in evidence (without objection) *by the State* through her witness Robert Kennon, who testified,—" On the morning of the 14th day of July, A. D. 1881, I drove a cow to the pen of Mr. Jordan, the defendant, where I had some other cattle, and, after putting the cow in the pen, I, in company with Wm. Heard, rode off in the direction of where a son of the defendant lives. When about a mile or a mile and a half from defendant's house, near the house of Kirksey, defendant, who was in the field, hallooed to us and came out to where we were. He, defendant, as soon as he got to us, asked me if Mr. O'Daniel was in Flatonia. I told him I did not think he was; that I believed he was off at Major Penn's camp-meeting. Defendant then asked me who was acting in his place as constable. I told him I did not know, but thought Mr. Doggett or Mr. Evans was. I then asked him what was the matter. He told me he wanted to give himself up; that he had killed Mr. Hasselmeyer, and that he had to do it. Defendant said that, about sunrise, he was at his cow-pen, and heard Hasselmeyer's dogs after his, defendant's, hogs; that he heard his hogs squealing; that he went to his house and got his gun, intending to kill the dogs; that he got in sight of the dogs and had his gun cocked on them, when he first saw Hasselmeyer coming; that he asked Hasselmeyer if he was going to kill his hogs? That Hasselmeyer replied, 'No, d—n you; I will kill you,' and as he said this he threw his left hand behind him. That when he saw Hasselmeyer make this motion he shot him."

Other evidence showed that deceased was "a left-handed man;" that when the body was found the dead man was lying upon his back, his face upwards, his right arm lying by his side, and his left partly under the body. It was in proof, however, that deceased, when he left home and when found dead, was in his shirt-sleeves,— had on no coat,— had no hip or pistol pocket in his pants,— had no weapon on, nor was any found about his person, save an ordinary pocket knife, which was found shut up in one of the pockets of his pants.

. The charge of the court is not complained of in so far as it presented the law of murder. Upon the law of self-defense the charge of the court was: "If you believe from the evidence that the defendant did kill Joseph Hasselmeyer, and if you further believe from the evidence that, at the time of the killing, the deceased was making such an attack upon the defendant as to produce a reasonable expectation or fear of death or some serious bodily harm, or if you believe from the evidence that, at the time of the killing, the deceased was threatening to take the life of the defendant, and did then, by some act done, manifest his intention to execute the same, you will acquit. Nor is it required that the danger be actual and real if such danger, under the circumstances surrounding the parties, reasonably appeared so. The jury will determine whether in fact the defendant was in danger, or that there was a reasonable appearance of danger; and if you believe at the time of killing (if you believe defendant did kill Hasselmeyer) that said Hasselmeyer was not in a condition to seriously injure the defendant, but if you believe he did know he was in no such danger, or could have known it by reasonable care exercised, then such killing would not be justifiable."

. Objection has been made, and, as we think, not without reason, to the latter portion of this charge. It was certainly calculated to mislead the jury, in telling them that they would " determine whether in fact the defend-

ant was in danger." That was not the question to be determined by them. The evidence, as they had it before them, showed really that deceased was wholly unarmed,— that he did not even have a hip-pocket in which to carry a weapon,— and with knowledge of such facts in evidence before them we imagine it would not be difficult for them to arrive at the conclusion that defendant was in fact in no danger. But did defendant have the same knowledge of these facts at the time of the killing? The law does not hold him to the actual existence of danger, but the criterion of action with him is that "it must reasonably appear by the acts, or by words coupled with the acts, of the person killed that it was the purpose and intent of such person to commit murder or inflict serious bodily harm upon him." Penal Code, art. 570. And again: "The attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or serious bodily" harm. Penal Code, art. 574. The question is not one of actual danger, but of reasonable apprehension of danger. And it is one which in all fairness can only be determined by the facts as they appeared to the party killing at the very time of the homicide; and not by the facts as they may be shown really to have existed, after a calm, quiet and thorough investigation by a jury. As was said in Richardson's case, "a defendant is always justifiable in acting for his defense, or the defense of his family or property, according to the circumstances as they reasonably appear to him, and it is but just and right that his action should be judged of in the light of the circumstances as they appeared to him at the time. Such is our understanding of the law, and such the rule of decision in this State. It is not necessary that there should have been actual danger, provided the party acted on a reasonable apprehension of danger." *Richardson* v. *State*, 7 Texas Ct. App. 486, and authorities cited.

Nor is the other proposition submitted by the court,

viz., that the jury will determine whether "there was a reasonable appearance of danger," any more nearly correct in law than the one just noticed; because, in determining that question, the jury would in the very nature of things, look to all the facts in evidence before them, many of which might not, could not, and doubtless were not known to the defendant at the time of the killing. The question was not how the facts and circumstances appeared to the jury after hearing all the evidence, but, on the other hand, were the facts and circumstances, as they appeared *at the time* to the defendant, such as that they can say he had reasonable grounds for his belief that he was in danger of death or serious bodily harm. *Blake.* v. *State,* 3 Texas Ct. App. 581.

Again: in the paragraph quoted from the charge, the jury were further told, "If you believe he (defendant) did know he was in no such danger, *or could have known it by reasonable care exercised,* then such killing would not be justifiable." A party who has reasonable expectation or fear of death or serious bodily harm, imminent and pressing under the circumstances as they appear to him, is not required to wait until he has by the exercise of reason carefully examined all the facts necessary to be known as to the truth and correctness of his apprehensions. To require this would be to render entirely nugatory and worthless that kind and humane provision of the law which allows him to act, and act promptly, even to the taking of his assailant's life, when it reasonably appears by the acts, or by the words coupled with the acts, of the person killed that it was the purpose and intent of such person to take his life or to do him some serious bodily harm. When a man has a reasonable expectation or fear of death or of some serious bodily harm from an unlawful attack made upon him, he may kill, and kill upon the very spur of the moment, and the law will justify the homicide without requiring him to show that by

the exercise of additional care the killing could not have been avoided with safety to himself. Penal. Code, art. 574; *Ross* v. *State*, 10 Texas Ct. App. 455; *Kendall* v. *State*, 8 Texas Ct. App. 569; *Ainsworth* v. *State*, Id. 532. It is only in cases where the unlawful attack upon person or property is not made with a purpose of taking his life or doing him serious bodily harm, that the party assailed is required not only to exercise care but to resort to all other means save retreating, before he can justify the taking of human life. Penal Code, art. 572; *Kendall* v. *State*, 8 Texas Ct. App. 569; *Hill* v. *State*, 10 Texas Ct. App. 618.

The first, second, and third special instructions requested for defendant embodied a correct enunciation of the principles of the law of justifiable homicide in self-defense, as applicable to the evidence in the case, and should have been given instead of the charge above discussed. It is unnecessary further to discuss the charge of the court with reference to the confessions or admissions of defendant, than to say that the fifth special instruction on this branch of the case requested for defendant was a correct expression of the law as held by this court in *Pharr* v. *State*, 7 Texas Ct. App. 472, whilst the charge as given was not wholly free from objection.

For error in the charge of the court as above pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*